Douglas C. Erickson, Bar No. 012130
derickson@mmcec.com
Daniel D. Maynard, Bar No. 009211
dmaynard@mmcec.com
**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
3200 N. Central Ave., Ste. 1800
Phoenix, AZ 85012
Telephone: (602) 279-8500
Facsimile: (602) 263-8185

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN3 LLC, a New Mexico limited liability company, d/b/a 1N3 LLC,<br><br>          Plaintiff,<br><br>v.<br><br>Active Network, Inc., a Delaware corporation; Active Network, LLC, a Delaware limited liability company,<br><br>          Defendants. | CV_____<br><br><br><br>**COMPLAINT** |

Plaintiff IN3 LLC, for its complaint against Defendants Active Network, Inc. and Active Network, LLC alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff IN3 LLC ("1N3") is a limited liability company organized under the laws of the State of New Mexico, with its principle place of business in Phoenix, Arizona. It does business as 1N3 LLC.

2.      Defendant Active Network, Inc., is a Delaware corporation, with a principle place of business in San Diego, California and/or Dallas, Texas.

Maynard Cronin Erickson Curran & Reiter, P.L.C.
ATTORNEYS AT LAW
3200 N. Central Avenue., Ste. 1800
Phoenix, Arizona 85012

3.     Defendant Active Network, LLC is a Delaware limited liability company, with principle place of business in San Diego, California and/or Dallas, Texas.

4.     Due to Defendants' use of the names of the aforementioned entities in contracts, on websites, and in marketing, it is unclear whether Active Network, Inc. and Active Network, LLC are one and the same entity, affiliates, separate companies, or the alter ego of one another or some principal or owner.  For convenience herein, Defendants are referred to collectively as "Active Network."

5.     The amount in controversy exceeds $3 million in that Active Network has possession or control of more than $600,000 that belong to 1N3 and has committed acts causing direct and proximate damage to 1N3 in additional amount of more than $2 million.  Additionally, treble damages, pre-judgment interest, and attorneys' fees are recoverable under various statutes that apply to the facts alleged herein.

6.     As they relate to this civil action, Active Network has caused acts to occur and damages to result throughout the United States, and particularly in Arizona.

7.     Active Network has continuous and systematic contacts with the State of Arizona.

8.     Active Network has purposefully directed its activities and consummated numerous transactions within Arizona and/or with its residents.

9.     This Court has jurisdiction, pursuant to 28 U.S.C. §§ 1331, 1332, 1337(a), and 1338.

10.     The Court has jurisdiction under 15 U.S.C.A. § 1121 and 28 U.S.C.A. § 1338(a) in that claims herein arise under the Trademark Laws of the United States, 15

U.S.C.A. §§ 1051 *et seq.*

11.     The Court has jurisdiction of the unfair competition claims herein under the provisions of 28 U.S.C.A § 1338(b) in that said claims are joined with a substantial and related claim under the Trademark Laws of the United States, 15 U.S.C.A. §§ 1051 *et seq.*

12.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c).

## GENERAL ALLEGATIONS

13.     Beginning in approximately early 2013, Active Network approached 1N3 to solicit and propose a business relationship.

14.     Active Network offered software and an Internet platform for registering participants for events such as races and marathons.

15.     1N3 was and is in the business of organizing and managing certain recreational, social, and athletic events known as BlackLight Run® and Foam Glow 5K.

16.     Participants in these events, which are staged nationwide, typically sign up for a 5K run that involves the introduction and creative use of black light and color in various mediums, social interaction, charitable fund-raising, and entertainment.

17.     There are social and competitive aspects to the events, but primarily they are geared toward team-building and creating a fun environment.

18.     There is a component of the events that is charitable in that 1N3 commits to donate an amount or percentage of revenues generated to local charities in areas where events are staged.

19.     Over the last two years, 1N3 has invested significant resources to build its brand and goodwill, and that of BlackLight Run® and Foam Glow 5K, among others.

20.     1N3's success is based largely on the favorable reputation and buzz that has been created on social media, word of mouth, and its goodwill and brand recognition.

21.     In approximately March 2013, 1N3 and Active Network started doing business together with Active Network providing a system and platform for event registration services.

22.     1N3's decision to enter into a relationship with Active Network was based on specific representations made by Active Network about its ability to competently provide all registration-related services required by 1N3 and its customers for these events, and to timely remit fees to 1N3, providing the cash flow necessary to run the business.

23.     Beginning in 2014 or earlier, Active Network's performance was less than promised.

24.     Among other things, commerce share monies that were due to be paid to 1N3 on October 30, 2014 were not paid until January 15, 2015.  Such delays became commonplace, even for monies that Active Network was required to remit on a weekly or bi-weekly basis.  During the fourth quarter of 2014, remittances to 1N3 of the fees it was owed were so delinquent that 1N3 experienced operational difficulties due to the sporadic cash flow and 1N3 eventually feared it was not going to be paid what it was owed and that it might be unable to put on the events for which participants had registered.

25. In order to provide the cash flow needed to run the events it planned and for which it had already accepted registrations, 1N3 explored alternative systems and services to register participants.

26. Active Network aggressively, and according to some consumers fraudulently, sold its "Active Membership" product to 1N3's customers by requiring them to "opt out" of the membership during the registration process. In other words, unless consumers noticed that they had to check a box or in some cases uncheck a box on a particular screen while signing up for a 1N3 event, Active Network automatically enrolled them in Active Network's separate program and charged them a significant membership fee.

27. This practice by Active Network has been the subject of social media commentary as a "scam" and, upon information and belief, it has been investigated by government agencies. In particular, the State of Iowa sanctioned Active Network's practices.

28. The practice and its widespread characterization as a scam discouraged some potential 1N3 customers from registering for events if they could only do so through Active Network.

29. Access to Active Network's platform, via the Internet, was a critical tool used by 1N3 to manage its contractual relations with its customers on a day-to-day basis, fulfill customer service obligations, respond to inquiries, communicate event information, and to provide the product that it sells to its hundreds of thousands of customers.

30.     Among other things, 1N3 utilized the platform to confirm registrations, transfer registrations for those customers who desired to change events or participants, and on occasion, process refunds to customers who were entitled to refunds based on special circumstances.

31.     On or about March 10, 2015, Active Network unilaterally terminated 1N3's access to its system, platform, and data.

32.     Although access was temporarily restored on March 14, 2015, it was again terminated and has been denied since March 15, 2015.

33.     There were two 1N3 events scheduled for the weekend of March 14, 2015.

34.     In the hours leading up to those events, 1N3 was unable to confirm registrations or process changes in those registrations.

35.     Therefore, it experienced thousands of people showing up at the events to receive registration packets and information for which they presumably had paid, but 1N3 was unable to confirm many of the participants' identities or their registrations.

36.     This denial of information caused long lines to form and delayed the start of those events (and events that have taken place since March 14, 2015).

37.     Predictably, and as Active Network likely intended, those delays caused unrest and dissatisfaction among the participants.

38.     The negative reaction on social media was swift and damaging.   1N3's reputation and good will was immediately harmed.

39.     Since that time, six 1N3 events have been held.  Problems similar to those described above have been experienced at each of those events.

40.    In each instance, there has been widespread frustration and anger expressed by 1N3's customers.

41.    The denial of access to the registration information has caused the running of those events to appear to be far less efficient and professional than 1N3 had developed a reputation for performing.

42.    During the time that Active Network denied access to its platform and data to 1N3, upon information and belief, Active Network manipulated registration pricing for several events without authorization.  These actions further damaged 1N3's goodwill and reputation and caused customer confusion and dissatisfaction.

43.    On several occasions, but no later than March 12, 2015, 1N3 gave notice to Active Network of its multiple material breaches of the agreement under which they were operating.

44.    Active Network did not cure said breaches within thirty days.

45.    On April 17, 2015, 1N3 formally confirmed termination of the agreement with Active Network and demanded that it cease and desist in the use of all marks associated with, owned by, or licensed or used by 1N3.

46.    The acts and omissions of Active Network as alleged herein were done with an evil mind.  Active Network acted outrageously and intolerably, demonstrating a deliberate disregard of the interests and rights of 1N3 and its customers.

## COUNT ONE

### (Breach of Contract)

47.     Plaintiff hereby incorporates the allegations of paragraphs 1 through 46 as though fully set forth herein.

48.     In approximately March 2014, 1N3 and Active Network entered into a servicing agreement whereby Active Network continued to provide the system and platform for event participants to register and pay their fees online.

49.     For each registration, 1N3 was to be paid the registration fee, less certain charges and offsets.

50.     Pursuant to an agreement to share processing fee revenue, 1N3 was to be paid an additional amount.

51.     Pursuant to a commerce share agreement, 1N3 was to be paid an additional amount.

52.     Some of the terms of the parties' agreement are reflected in written documents and addenda.

53.     Not all terms of the agreement are accurately set forth in documents, and some of the terms that are set forth were not negotiated or expressly agreed to among the parties.

54.     In approximately June 2014, it appeared that Active Network could not provide adequate services with respect to, in particular, providing on-site access to its platform during the time that participants were checking in for an event.  This short-coming caused considerable delay and problems in running the events in a timely and

professional fashion.

55.     For that reason, in August 2014, the parties agreed that Active Network would pay the cost of 1N3 obtaining the services of a third-party vendor who could provide adequate on-site check-in services.

56.     Notwithstanding this agreement, and notwithstanding numerous requests, Active Network has failed to pay the third party vendor.

57.     Beginning in 2014, Active Network failed to make timely payments to 1N3 of amounts due and owing.

58.     Presently, although Active Network has denied 1N3 access to current data, at least the following amounts that are due and owing to 1N3 are being retained by Active Network:

A.     For registrations processed in March 2015, no less than $301,000;

B.     For revenue sharing fees (BlackLight Run®) in the first quarter of 2015, no less than $166,000;

C.     For revenue sharing fees (BlackLight Run® UK) in the first quarter of 2015, no less than $35,000;

D.     For revenue sharing fees (BlackLight Run® UK) in the fourth quarter of 2014, no less than $9,000;

E.     For revenue sharing fees (Foam Glow 5K) in the first quarter of 2015, no less than $105,800;

F.     For commerce sharing fees (BlackLight Run®) in the first quarter of 2015, no less than $29,100;

G.      For commerce sharing fees (BlackLight Run® UK) in the first quarter of 2015, no less than $6,170;

H.      For commerce sharing fees (BlackLight Run® UK) in the fourth quarter of 2014, no less than $1,577;

I.      For commerce sharing fees (Foam Glow 5k) in the first quarter of 2015, no less than $18,500.

59.      These breaches of the agreement by Active Network have caused and continue to cause a variety of damages to 1N3.  Without limitation, those damages include not being able to timely pay 1N3's expenses and limit its ability to leverage cash flow to secure additional venues for additional events and thereby grow its business.

60.      As of April 1, 2015, Active Network was wrongfully withholding no less than $648,000.

61.      By the other acts and omissions described above, including but not limited to failing to pay the cost of a third party vendor and denying 1N3 access, Active Network has breached its contract with 1N3.

62.      As a direct and proximate result, 1N3 has been damaged.

### COUNT TWO

**(Breach of Covenant of Good Faith and Fair Dealing)**

63.      Plaintiff hereby incorporates the allegations of paragraphs 1 through 62 as though fully set forth herein.

64.      The agreement described above includes a covenant of good faith and fair dealing.

1

2

3        65.    Through the conduct described above, Active Network has wrongfully

4    denied 1N3 the benefits of its bargain.

5        66.    As a direct and proximate result, 1N3 has been damaged.

6                                    **COUNT THREE**

7                                    **(Lanham Act)**

8        67.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 66 as

9

10    though fully set forth herein.

11        68.    1N3 adopted the mark BlackLight Run® and used it in interstate commerce

12    for organizing, arranging, and conducting running events and running competitions on

13
      March 18, 2013.  On May 18, 2013, 1N3 filed an application for registration of said mark
14

15    in the United States Patent and Trademark Office ("PTO").  On May 6, 2014, said mark

16    was registered in the United States PTO on the Supplemental Register.

17        69.    1N3 adopted the mark Foam Glow 5K and used it in interstate commerce

18
      for organizing, arranging, and conducting running events and running competitions on
19

20    June 12, 2013.  1N3 has common law rights in the mark Foam Glow 5K.

21        70.    1N3 has continuously used the marks to identify its services since on or

22    about March 18, 2013 for BlackLight Run® and since May 18, 2013 for the Foam Glow

23
      5K and to distinguish them from those promoted and sold by others by, among other
24

25    things, prominently displaying the marks on brochures, websites, flyers, application

26    forms, bills, and advertising throughout the United States.

27

28

71.     Active Network has infringed 1N3's marks in interstate commerce by various acts, including selling, offering for sale and advertising running events, competitions, and/or services under the marks BlackLight Run® and Foam Glow 5K without permission or authority of 1N3 and said use by Active Network is likely to cause confusion, to cause mistake and to deceive.

72.     Active Network's alleged acts of trademark infringement and unfair competition have been committed with the intent to cause confusion, mistake and to deceive.

73.     Upon information and belief, Active Network has known since early 2013 that said marks were the property of 1N3 and 1N3 has given notice that its mark is registered in the PTO by displaying with the mark as used with the letter R enclosed within a circle.   1N3 has requested Active Network to cease and desist from its acts of trademark infringement.

## **COUNT FOUR**

### **(Unfair Competition by Infringement of Common Law Rights)**

74.     1N3 hereby incorporates the allegations of paragraphs 1 through 73 as though fully set forth herein.

75.     Said acts of Active Network constitute unfair competition and an infringement of 1N3's common law rights in said marks.

76.     Active Network's use of 1N3's marks in connection with services which Defendants have sold in interstate commerce is in violation of Lanham Act § 43(a) in that it is likely to cause dilution by impairing the distinctiveness in 1N3's marks and/or by

harming the reputation of 1N3's marks, all causing irreparable harm to 1N3.

77.     Active Network committed these acts willfully and with the intent to harm the reputation of 1N3's marks.

78.     By reason of Active Network's acts alleged herein, 1N3 has and will suffer damage to its business, reputation and good will and the loss of sales and profits 1N3 would have made but for Active Network's acts.

## COUNT FIVE

### (Interference with Contract)

79.     Plaintiff hereby incorporates the allegations of paragraphs 1 through 78 as though fully set forth herein.

80.     1N3 forms hundreds of thousands of contractual relationships each year, at least one with each participant at its events.

81.     1N3 contracts to provide a particular product and level of service.

82.     By terminating 1N3's access to Active Network's platform and data, Active Network has prevented 1N3 from being able to confirm registrations and timely check-in participants at events for which they registered through Active Network, precluded 1N3 from communicating event information to participants in advance of the event, and interfered with all forms of ordinary customer service, including transferring registrations, responding to inquiries, and processing refunds.

83.     As a direct and proximate result, 1N3 has been damaged.

## COUNT SIX

### (Conversion)

84.     Plaintiff hereby incorporates the allegations of paragraphs 1 through 83 as though fully set forth herein.

85.     Active Network has wrongfully exercised control or dominion over fees owed to 1N3 in violation of its rights.

86.     1N3 has suffered damages as a direct and proximate result.

## COUNT SEVEN

### (Negligent Misrepresentation)

87.     Plaintiff hereby incorporates the allegations of paragraphs 1 through 86 as though fully set forth herein.

88.     Prior to the parties agreeing to do business together, Active Network representatives made specific representations which they intended or on which they knew 1N3 would rely.  The representations included, without limitation and for purposes of example or illustration only:

A.     That registration funds would be paid promptly to 1N3;

B.     That Active Network would provide a dedicated representative to handle the 1N3 account and respond to 1N3's questions, concerns, and any problems with Active Network's system;

C.     That Active Network's system was "second to none," that it provided 100% reliability, and that the system experienced virtually no down time for processing registrations;

D.     That Active Network's system would provide the fastest and most complete system for registering participants and servicing their needs.

89.     These representations were material and false, and Active Network either made the representations knowing them to be false or it failed to exercise reasonable care or competence in obtaining or communicating the information.

90.     1N3 justifiably relied on the representations.

91.     As a direct and proximate result, 1N3 suffered damages.

## COUNT EIGHT

### (Breach of Fiduciary Duty)

92.     Plaintiff hereby incorporates the allegations of paragraphs 1 through 91 as though fully set forth herein.

93.     Active Network severed as 1N3's agent in transactions with hundreds of thousands of consumers.

94.     Active Network collected monies on behalf of 1N3 and held those funds for its benefit.

95.     1N3 placed trust and confidence in Active Network to process transactions, hold and pay amounts due, fully and truthfully disclose material facts, communicate with 1N3 customers, and act in the best interest of promoting 1N3's business.

96.     By terminating access to Active Network's platform and data even as participants were arriving at events Active Network prevented timely check-in, jeopardized 1N3's reputation and business, disregarded thousands of customers' time, commitment and loyalty, and Active Network breached a fiduciary duty to 1N3.

97.    By not fully disclosing to 1N3 information about event registrations and Active Network's own conduct, Active Network breached a fiduciary duty to 1N3.

98.    By manipulating prices without authority, Active Network breached a fiduciary duty to 1N3.

99.    By withholding fees, Active Network breached a fiduciary duty to 1N3.

100.    By misappropriating and misusing various marks, Active Network breached a fiduciary duty to 1N3.

101.    As a direct and proximate result of the foregoing acts and omissions, 1N3 suffered damages.

## COUNT NINE

### (Unjust Enrichment)

102.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 101 as though fully set forth herein.

103.    Active Network was enriched by collecting funds from 1N3's customers and being granted the opportunity to present other goods or services to them.

104.    1N3 was impoverished to the extent it became obligated to provide a product and service to those customers, incurred substantial expenses to stage and run events for which they registered, and was not paid the fees it was owed.

105.    Because there is no justification for Active Network's withholding funds, it had been unjustly enriched.

106.    If there is no adequate remedy at law, equity through this Court should provide one.

## COUNT TEN

### (Accounting)

107.   Plaintiff hereby incorporates the allegations of paragraphs 1 through 106 as though fully set forth herein.

108.   By agreement, Active Network has processed thousands of registrations to 1N3 events.

109.   Active Network has failed to account for all fees processed and sales made.

110.   1N3's share of fees is based on specific figures and/or percentages of sales.

111.   In order to determine the amounts due to 1N3, Active Network must provide a full accounting.

WHEREFORE, 1N3 prays for judgment against Defendants on all counts other than 3, 4, and 10, as follows:

A.   For compensatory damages in an amount to be determined at trial;

B.   For prejudgment and post-judgment interest as allowed by law;

C.   For punitive damages in an amount to be determined at trial;

D.   For an award of Plaintiff's taxable costs incurred herein;

E.   For such other and further relief as the Court deems just and proper.

WHEREFORE, 1N3 prays for judgment against Defendants on Counts 3 and 4, as follows:

A.   That this Court grant an injunction pursuant to the powers granted it under 15 U.S.C.A. § 1116, enjoining and restricting Active Network and its agents and

employees from (1) directly or indirectly using the marks BlackLight Run®, Foam Glow 5K, or any marks similar to 1N3's marks which is likely to cause confusion, mistake or to deceive, and (2) continuing any and all acts of unfair competition as herein alleged.

B.      That Active Network be required to account to 1N3 for any and all profits derived by Active Network from the sale of its services and for all damages sustained by Plaintiff by reason of said acts of infringement and unfair competition complained of herein.

C.      That this Court award 1N3 treble the amount of actual damages suffered by 1N3.

D.      That the Court award 1N3 its costs incurred herein.

E.      That the Court find this to be is an exceptional case and that 1N3 be awarded its reasonable attorneys' fees.

F.      That this Court grant such other and further relief as it deems just and proper.

WHEREFORE, 1N3 prays for relief against Defendants on Count 10, as follows:

A.      For a full accounting;

B.      For an order requiring all amounts due and owing to 1N3 be paid forthwith;

C.      For an award of attorneys' fees;

D.      For an award of taxable costs;

E.      For such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

A trial by jury is hereby demanded as to all issues triable to a jury by law.

DATED this 17th day of April, 2015.

**MAYNARD CRONIN ERICKSON
CURRAN & REITER, P.L.C.**

By  /s/Douglas C. Erickson
Douglas C. Erickson
Daniel D. Maynard
3200 North Central Avenue, Ste. 1800
Phoenix, Arizona  85012-2443
Attorneys for Plaintiff